# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　　Plaintiff,<br>　　vs.<br>SHABAB KARIMI (3),<br><br>　　　　　　　　　　　Defendant. | CASE NO. 15-cr-02731-H-3<br><br>**MEMORANDUM DECISION FOLLOWING BENCH TRIAL** |

The Government brought an information against Defendant Shabab Karimi for a violation of Title 21, U.S.C. Sections 846 and 841 (a)(1) and (h)(4) for Conspiracy to Manufacture and Possess with Intent to Distribute Anabolic Steroids. (Doc. No. 30.) Karimi waived his constitutional right to a jury trial and agreed to have the case tried to the Court. (Doc. No. 81.) The case proceeded to a bench trial beginning on June 21, 2016. Lindsey Forrester Archer and Michael Wheat appeared for the Government. John Lanahan appeared for the Defendant Karimi.

In order for the Government to prove its case against the Defendant, the Government must prove by proof beyond a reasonable doubt the following elements of a conspiracy:

1.　　Beginning on a date unknown and continuing up to September 14, 2015, there was an agreement between two or more persons to manufacture anabolic steroids

and to possess with intent to distribute anabolic steroids; and

    2. Karimi became a member of the conspiracy knowing of its object and intending to help accomplish that object.

The legal standards for a conspiracy are well-settled. A conspiracy is a kind of criminal partnership - an agreement of two or more persons to commit one or more crimes. United States v. Abushi, 682 F.2d 1289, 1293 (9th Cir. 1982). The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed. United States v. Iribe, 564 F.3d 1155, 1161 (9th Cir. 2009). A defendant charged in a conspiracy need not have knowledge of all the purposes or participants in the conspiracy to belong to a criminal conspiracy. United States v. Escalante, 637 F.2d 1197, 1200 (9th Cir. 1980); United States v. Kearney, 560 F.2d 1358, 1362 (9th Cir. 1977).

In United States v. Perry, 550 F.2d 524, 533 (9th Cir. 1997), the Ninth Circuit held that the government need not "prove that all of the defendants met together at the same time and ratified the illegal scheme." Additionally, a defendant's participation in a conspiracy may be inferred from the circumstantial evidence. United States v. Batimana, 623 F.2d 1366, 1368 (9th Cir. 1980). Indeed, "[t]he connection of the defendant to a conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt." Id. It is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. United States. v. Romero, 282 F.3d 683, 687 (9th Cir. 2002); United States v. Melvin, 91 F.3d 1218, 1224 (9th Cir. 1996). But it is not enough that they simply met, discussed matters of common interest, or acted in similar ways or perhaps helped one another. Melvin, 91 F.3d at 1224. There must be an agreement to commit at least one of the crimes alleged as an object or purpose of the conspiracy. United States v. Montgomery, 384 F.3d 1050, 1062 (9th Cir. 2004).

For a drug conspiracy, the government is not required to prove the commission of an overt act in furtherance of the conspiracy. United States v. Shabani, 513 U.S. 10,

1  15 (1994). Moreover, a defendant's possession of a substantial quantity of a controlled
2  substance may show that the defendant knowingly possessed the substance. <u>United</u>
3  <u>States v. Barbosa</u>, 906 F.2d 1366, 1368 (9th Cir. 1990). A conspiracy to commit a
4  crime "does not require completion of the intended underlying offense." <u>Iribe</u>, 564 F.3d
5  at 1161. With the legal standards in mind, the Court turns to the evidence presented at
6  the trial.

7  The Government first called a co-defendant, Robert Walters, to testify about the
8  conspiracy to manufacture and possess with intent to distribute anabolic steroids.
9  Walters testified that he arranged for the importation of steroids. He admitted to a prior
10 felony in Pennsylvania related to steroids. His supervision was transferred to San
11 Diego, and he spent six months in a halfway house. During Walters' time in the
12 halfway house, he met his co-conspirator Henry, a correctional officer at the halfway
13 house. Henry knew his prior record, and asked if Walters would get involved with
14 steroids for Henry. Walters continued to use his contact in Israel to get the steroid
15 product. Once he got the product, Walters mailed packages of steroids for
16 co-conspirator Henry. Henry introduced him to Karimi, an individual he met at another
17 halfway house. Henry knew that Karimi had many contacts in the bodybuilding field.
18 Henry and Walters discussed with Karimi that they had steroids available and asked if
19 Karimi was interested in helping them sell the steroids.

20 Walters had the product mailed to Henry's P.O. box in San Ysidro from his
21 Israeli source who used a company name of Skyrocks. Once the raw materials were
22 delivered to the P.O. box in San Ysidro, Walters got the product ready to distribute.
23 The powders had to be put into an oil and had to be heated to dissolve the powder.
24 Walters used a storage unit in National City that Henry had arranged for through an
25 individual named Apodaca. Walters would use a hotel room to get the product ready
26 to market or sometimes they would go to Karimi's house and use his house to get the
27 product ready to market. Karimi had his own customers and Walters' overseas contact
28 had his own customers. Walters did not profit from the customers of his overseas

contact. But he would profit from Karimi's sales to his customers.

Walters' overseas contact taught him how to manufacture the steroids. Walters took the powder, used a pyrex cup, heated it up, mixed the powder with oil, and filtered the liquid steroid into the vials. Henry paid for the equipment. Walters used the equipment at Karimi's house, but more often at Walters' hotel. He also had some tabs that were taken orally. Karimi told Walters that Karimi was distributing the product to his customers. Walters was not present, but Karimi let him know what his customers needed. Whatever Karimi sold, Karimi and Walters split the proceeds. Karimi was selling about $1000 of product a week mostly in the $25 to $65 range. After he prepared the steroids for distribution, he mailed the product to the overseas customers or dropped them off at Karimi's house. Walters used different post offices. One of them was near Karimi's Scott Street address. Karimi accompanied him to the post office on occasion.

On cross-examination, Walters testified that he had a prior conviction for a felony involving steroids. His supervision was transferred to San Diego. Ultimately, the judge revoked his probation, and he served 180 days at a halfway house. While there, he met his co-conspirator Henry in San Diego. After his arrest in this case, Walters pled guilty pursuant to a written plea agreement with the Government. As a result of his plea in this case, he may receive a reduced sentence for assisting the Government.

Walters met Henry, a case manager at the halfway house who had access to Walter's file. Henry approached him within the first month or two and brought up Karimi's name because Henry met Karimi at another halfway house. When Walters got out of the halfway house, Henry stayed in contact with Walters and Karimi. Walters was to contact his overseas contact, set it up and go from there. Henry said that he had people that would distribute the product for him.

Walters was a previous bodybuilder and was familiar with steroid use. A cycle is a 10 to 16 week combination of steroids and ancillaries. Ancillaries limit the effects of the steroids. The cycle may include steroid injectables, orals, and proper food.

Walters obtained his supply from an overseas supplier that used the company name Skyrocks, which also was a supplier of steroids online. Walters found out how to manufacture the steroids about 16 months ago from his overseas contact. Before, his role was limited to a distributor of the product through the mail. In this case, he was also a mailer for his overseas contact's customers, but he would not make money from those sales. His overseas contact paid him in extra product that Walters could sell on the street. Sometimes he went to Karimi's house more than two to three times a week.

Walters ordered the product from his overseas contact that was delivered to Henry's P.O. Box in San Ysidro. When the product arrived, Henry picked it up and took it to a storage unit in National City. An individual named Apodaca rented the storage unit in National City for Henry. Both Henry and Walters would pick up the product from the storage unit.

Walters was responsible for getting the powder product into liquid form. The manufacturing took place at a different site. Some were hotel rooms rented by Henry mostly in San Ysidro near his P.O. Box. Walters kept the manufacturing equipment at the hotel or in the storage unit. A couple of times, they kept the manufacturing equipment at Karimi's house. On arrest, the equipment was in the hotel room or the storage space.

Walters only made money in this scheme from the local steroid distribution. He had detailed records of his overseas activity. He did not keep detailed records of the local sales. Skyrocks had a detailed labeling system to differentiate the products. He used a fake business, C&M Plastics, and fake return addresses so the sales couldn't be traced to him. Walters used steroids at Karimi's place and Karimi injected him. Karimi was a successful competitor in bodybuilding. Walters got about $1,000 a week from Karimi's sales. Walters was doing all of the legwork with a little assistance from Henry.

On redirect, Walters testified that Karimi assisted with the manufacturing process by putting the steroids into the vials and labeling the product. Examining Walters'

testimony with greater caution than a regular witness, the Court finds Walters to be generally credible notwithstanding his involvement in the crime and his potential for a reduced sentence which he downplayed.

The Government next called the case agent Melissa Schrettner, a special agent with the Drug Enforcement Administration. She testified that she worked with her special agent John Gieson of the DEA on this case. She executed a search warrant and conducted a search of the Defendant's residence at 1021 Scott Street, No. 140, San Diego, CA. She found steroids (Exs. 100-4 through 100-8, 100-10 through 100-15, and 100-19 through 100-23), at Karimi's residence including yellow tabs, red tabs, blue/white tabs, blue vials, grey vials, purple vials, red vials, black vials, magenta vials, white vials, pink vials, orange vials (2), red vials (2), and white tablets. She also found a vial of HGH (Ex. 100-9), a pill bottle with white tablets (Ex. 100-16), Cialis tablets (Ex. 100-17), insulin (Ex. 100-18), unmarked vials and syringes (Ex. 100-24), an HGH lab report (Ex. 100-34), a steroids price list (Ex. 100-35), labels (Ex. 100-36), and two steroid cases (Ex. 100-37).

On cross-examination, the defense played relevant portions of the video and audio of the execution of the search warrant at Karimi's residence and established where most of the steroids were seized in the apartment. The Court finds Schrettner to be credible.

The Government next called special agent John Gieson. He testified that he collected information on the use of the post office boxes and tracked Walters' vehicle through a court-approved tracker. The tracker showed that the car often went to the storage locker in National City rented by an individual named Apodaca and to post office locations. Gieson took photos of the packages that had been shipped at the post offices. (Exs. 400-11 through 400-24.) On occasion, he observed Henry and Walters open up a package obtained at the post office. Walters also went to the Scott Street address frequently. On one occasion, Gieson observed Karimi interact with Walters at the Scott Street address carrying a black duffel bag.

Gieson obtained a search warrant for Walters' hotel room at the La Quinta hotel. On execution of the search warrant, he found large vials (2) of steroids with a magenta lid, large vials of steroid including light blue, purple, yellow, pink, red, black (2), green, purple, and blue colored vials or tops. (Exs. 200-25 through 200-38.) In addition, he found three bags of steroid powder. (Ex. 200-39.) He also found white (2), blue (2), pink, yellow, peach and red steroid tabs. (Exs. 200-40 through 200-47.) He also found Cialis tablets (Ex. 200-49), HCG (Ex. 200-50), manufacturing/cooking equipment (Ex. 200-52), oils (Ex. 200-53), packaging materials (Ex. 200-54), receipts/shipping materials (Ex. 200-140), a Fed Ex from China (Ex. 200-141), steroid labels (Ex. 200-142), mailing and other supplies including ziploc bags with vial tops, a dispenser, tupperware, a crimper, and labels the same as at Karimi's apartment (Ex. 200-143), shipping/packaging supplies/labels and a duffel bag (Ex. 200-144), two scales (Ex. 200-145), unlabeled amber colored vials (Ex. 146), and a laptop computer (Ex. 200-148).

Items were also obtained from a search warrant at the storage locker, including a Mason jar/large vial (Ex. 300-30), a steroid Tren A (Ex. 300-31), numerous postal receipts, Skyrocks labels, vials matching vials in Karimi's residence and a duffle bag like the duffle bag he observed during Karimi's interaction with Walters. (Ex. 300-53).

Gieson also identified a price list obtained from Karimi's residence and a pay and owe sheet. (Ex. 100-35.) Gieson prepared a report that showed that the agents found in total on execution of the search warrants 233 steroid tablets and 920 mL of steroid liquid at Karimi's residence and also found 5,472 steroid tablets, 5140 mL of steroid liquid, and 541 grams of steroid powder at the La Quinta Hotel, a distributable amount. The Government also introduced the Israeli mailings from Walters' overseas supplier. (Exs. 400-4 through 400-10.)

On cross-examination, the defense asked Gieson about whether the DEA considered the manufacturers or the source of supply as the individuals at the top of the chain, and considered the distributors as further down the chain, including the street

level distributors at the bottom. The defense also inquired into other details about the evidence in the case suggesting Karimi's limited involvement or the co-defendants' attempt to conceal their involvement in the manufacture and distribution and other credibility issues. The Court finds Gieson to be credible. Following Gieson's testimony, the Government rested.

In the defense's case, the defense called Simi Karimi, the mother of the Defendant. She lived with her husband and son in August or September 2014 in La Mesa. This was after he got out of the halfway house. On one occasion, two individuals came unexpectedly to her house. She asked him who they were and he said that he met the young individual at the halfway house. They came other times to her house and he left with them. She was concerned about her son. He was supposed to finish a rehab program, but he didn't finish it. He was violated by probation and spent time in county jail. Thereafter, she got him a hotel room.

On cross-examination, she testified that she did not let him back in her house after he violated his probation. She did not like his lifestyle. He is 36 years old, but didn't have a job and stayed out late at night. When the men came to her house to see her son, she was concerned but couldn't hear what they said to him. She did not think that it was strange that they visited him, nor did she call the police. He didn't tell her who the people were. She was inquiring about the people because she was concerned for him. She visited him two times at the residence in Point Loma, but did not see the men there. She takes care of Karimi's child, but doesn't take the child to the Point Loma house.

The Court notes that the Defendant's mother is naturally biased in favor of her son. She had little to offer about whether Defendant Karimi participated in the conspiracy at the Scott Street address or other places. As a result, the Court discounts her testimony.

Defendant Karami testified that he was born in Iran and came to San Diego in 1982. He went to Patrick Henry High School and graduated in 1997. He went to San

Diego State University from 1997 to 2004. He studied communications with an emphasis in marketing. He started training in bodybuilding at San Diego State. He did well in competitions such as the San Diego world championship. Ten years later, he won his weight class. He wrote an article on biceps training in a muscle and fitness magazine. He was sponsored and well known nationwide as a bodybuilder. (See Exs. I, J.)

Bodybuilding requires cardio in the morning, an hour or two of weight training, and an intense regimen of measured prep meals and supplements. Most competitors take anabolic steroids. Anyone can use any performance enhancing drugs for the competitions.

He identified the Skyrocks price sheet for anabolic steroids. (Ex. 100-35.) He explained the type and purpose of the injectable and oral steroids and other items on the price list. He explained that a competitive bodybuilder needed an intense regimen including food and supplements to be effective.

He identified the substances found in his house and identified how he used them. Walters gave him everything. He clarified that he bought the steroids–the gear-- from Walters. He said that if he stayed on one for a certain time then he needed to switch and each had a specific purpose. He got insulin from a friend. Most of the items that were seized were in the kitchen because he was using them with his prep meals. The ones by the bedside were his injectables. Walters gave him the steroid cases. (Ex. 100-37.) He identified his syringe bag. (Ex. M.) All of the vials found at his house could go in his steroid cases or in his pill bottle or in the syringe bag. Walters provided him with the steroids. He used the scales to weigh food. He also smoked marijuana. He would not need to weigh the steroids with scales.

The Skyrocks price list contained the amounts he would have to pay Walters. (Ex. 100-35.) The handwritten note listed some of his friends and customers which he advised on recommended cycles and doses. (Ex. 100-35.) He denied being a supplier for one of the individuals on the handwritten note. He claimed that the costs on the note

were just his estimates of what a cycle would cost. (Ex. 100-35.) Karimi claimed that he would provide advice to individuals on the types and doses of steroids to take. He denied selling any steroids. He claimed that he used the steroids to get to a high level. As to why he had blank labels, he said that Walters gave them to him or that they were trash.

A lot of people followed him on social media. He posted a daily regimen to his friends. Then he worked out and got his meals ready. He was setting up appointments for his clients. He charged between $30 to $60 per session. He got his shots ready. He met people to train them. His dad paid the rent. He made about $200 to $1,000 a week. He bought steroids from Walters. He lived in Point Loma because it was close to World Gym. As long as his client had a membership, he could train his client at World Gym. He took pictures with the neighbors' Lamborghini and had business cards for marketing purposes. (Ex. K.)

He admitted to a previous crime involving GHB. That is why he was at a halfway house when he met co-defendant Eric Henry. Later, Henry showed up at his house with Walters. Henry introduced him to Walters as the person with the connection to anabolic steroids. They came to his house several times. They gave him supplies of steroids. They wanted him to sell the steroids to his friends and customers. They had him go around to gyms to see if anyone wanted anything. He felt that he owed them because they gave him supplies. He explained that he can't simply go into a gym and try to sell steroids. No one wants to openly buy steroids. It doesn't work that way. He is a high level competitor, so he is open to admitting to steroid use but most people are not.

When Walters and Henry came to his house, they scared his mother. But she didn't know that he was trying to build his clients and he needed "the gear." Walters was very persuasive. He said "help me help you." He wanted him to introduce Walters to his friends that wanted steroids. Karimi introduced him to some people. Walters and Henry were pushy.

When Karimi moved to Point Loma, Walters came over frequently. He brought more steroids, including bulk quantities. He had never seen bulk steroids before. The bulk quantities had to be processed to be used. He also brought the filter. (Ex. C.) Karimi admitted to transferring the steroids from the bulk jar into the vials and labeling the vials with the correct top. Karimi didn't do anything to convert the powder into liquid. Walters also gave him pills.

Henry called the shots. Apodaca helped Henry and Walters out with the equipment locker. The steroids were sent to Henry's post office box, and Walters brought them over. Karimi denied mailing steroids for Henry or Walters. Walters told Karimi to help him or he would not get his supply. Karimi said that he had to work for him because he needed his supply of steroids. Karimi denies selling or distributing steroids. Walters expected him to pay him or do favors for him. He paid Walters a couple of hundred dollars a week, but he needed his supply of steroids and didn't pay. Karimi's only employment was with his clients and a couple of times a month at his dad's bike shop so he couldn't afford the steroids. Walters kept coming over with his duffel bags even though Karimi didn't like it but Karimi needed his supply of steriods.

Karimi didn't want to get caught. This was "the best collection of gear he ever saw." He admitted that he was a gear doctor. He got a price list of products. He identified the duffel bag that Walters brought to his house. (Ex. 300-53.) MCT oil is used to cook the steroid powder into liquid. (Ex. 200-53). He denies cooking the powder at his house. He denied sterilizing the vials at his home. He denies selling the steroids to his customers, but admits helping with the labels. Walters left many unused labels at his house. (Ex. 100-36.) He claims that the bag with the labels was left for trash, but it was found in his bedroom closet. Some of the labels appear to be used. The labels were to identify the type of steroid in the vial.

Walters came to his house and said that you owe me money. If you want your gear, you have to help me now. If he didn't, then Walters would take his gear away. He took it away two other times when he was at his parents because he didn't pay him

for it. Walters wanted to take money from him and to get to Karimi's customers. Defendant admitted that he has two drug felonies.

On redirect, the defense emphasized that Defendant's motivation was to get steroids in order to do his training and bodybuilding. The defense also tried to minimize the unused labels. The Defendant described the bag as trash. The defense pointed out the bag with the unused labels also included several used insulin syringes. The defense exhibits include a video of Defendant's residence (Ex. F), photos of a bottle top dispenser and crimper (Exs. C, D-2), photos of Karimi as a bodybuilder and at the gym (Exs. I, J), Karimi's business card (Ex. K), and Karimi's injectables kit (Ex. M). In evaluating Karimi's testimony, the Court finds Defendant Karimi to lack credibility on key points.

After considering all of the evidence and evaluating the credibility of the witnesses, the Court finds in favor of the Government and against the Defendant. The Government produced corroborating evidence of defendant Karimi's involvement in the conspiracy. Specifically, the Government had testimony from agent Gieson that he monitored Walters' movement through a court-ordered GPS surveillance. The surveillance showed that Walters went from his hotel room in North County to the P.O. box in San Ysidro, then to the equipment storage locker, then multiple times a week to defendant Karimi's residence at Scott Street. Agent Gieson also credibly testified that he saw Walters take duffel bags from the storage locker to Scott Street. He saw Walters leave the Scott Street residence with manila mailers and go to the post office. The physical evidence also supports Defendant's involvement in the conspiracy. Approximately 100 vials were found in his house with used and unused labels. Exhibits 100-4 through 100-37 consist of the items seized at Defendant's residence including numerous injectable and oral steroids, labels, vials, a price list and Defendant's handwritten note.

Defendant's admissions also prove Defendant's involvement in a conspiracy. The Defendant admitted helping Walters because he provided him with "his gear."

Karimi admitted that he was involved in the repackaging of the steroids. The statutory definition of "manufacture" includes "the preparation . . . or processing of a drug or other substance" and includes "any packaging or repackaging of [a] substance or labeling or relabeling of its container." 21 U.S.C. § 802(15). Karimi admitted to helping Walters repackage the steroids from a bulk bottle to smaller vials. This was significant because injectable steroids cannot be used from the larger bottle. The smaller vials permit a person to use a syringe with the smaller vial. Karimi also admitted to going to gyms with Walters eight to ten times. The reasonable inference from the evidence is that the purpose was to introduce Walters to customers for distribution. In sum, the credible evidence leads to the conclusion that Karimi agreed to participate in a conspiracy to manufacture and possess with intent to distribute steroids.

The Court rejects Defendant's theory of multiple conspiracies and rejects his testimony that he is not a part of the conspiracy because he was forced to deal with Walters and Henry to maintain his supply of steroids. The Court rejects Defendant's testimony that he only transferred the bulk steroids for his individual use and had no participation in a conspiracy to possess with the intent to distribute steroids or manufacture steroids. The Court rejects Defendant's suggestion that Walters left labels at his house but that Karimi did nothing with the labels for purposes of distribution. The Court rejects Defendant's testimony that he only trained with his clients and had nothing to do with the supply or manufacture of steroids. The Court rejects Defendant's testimony that he could get the steroids from Walters for a fraction of the price but have nothing to do with providing a source of supply for his clients.

Rather, the Court agrees with Defendant's admission that he did as much as he could to get "his gear." For example, the Defendant admitted that he was using his body as a billboard to get the clients. The reasonable inferences from the evidence lead to the conclusion that Defendant was a participant in a conspiracy to manufacture steroids and a conspiracy to possess with the intent to distribute steroids. In sum, the

1  Government has proved each element of the crime by proof beyond a reasonable doubt.
2  Specifically, the Court concludes that the Government proved beyond a reasonable
3  doubt that:
4      1.    Beginning on a date unknown and continuing up to September 14, 2015,
5  there was an agreement between two or more persons to manufacture anabolic steroids
6  and to possess with intent to distribute anabolic steroids; and
7      2.    Karimi became a member of the conspiracy knowing of its object and
8  intending to help accomplish that object.
9      As a result, the Court finds the Defendant Shabab Karimi guilty of a violation of
10 Title 21, U.S.C. Sections 846 and 841 (a)(1) and (h)(4) Conspiracy to Manufacture and
11 Possess with Intent to Distribute Anabolic Steroids.
12 **IT IS SO ORDERED**.
13 DATED: June 24, 2016

_____
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT